656 So.2d 325 (1995)
James R. WILLIAMS, Jr.
v.
Sandra WILLIAMS.
No. 93-CA-00624-SCT.
Supreme Court of Mississippi.
June 8, 1995.
*326 Lisa B. Milner, Young, Scanlon & Sessums, Jackson, for appellant.
William R. Wright, Wright Law Firm, Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
PRATHER, Presiding Justice, for the Court:
We grant this petition for rehearing. The original opinions are withdrawn and this opinion is substituted therefor.

I. INTRODUCTION
This case concerns child custody. James R. Williams, Jr. (James) has appealed this case from the Chancery Court of Rankin County, vesting permanent primary child custody with the wife, Sandra Williams (Sandra). In addition, the court awarded a divorce to James on the grounds of Sandra's adultery and to Sandra on the grounds of James' habitual cruel and inhuman treatment.
James appealed the ruling to this Court, asserting the following errors:
1) WAS THE AWARD OF CUSTODY TO SANDRA WILLIAMS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE, BASED UPON THE SAME TESTIMONY ON WHICH THE CHANCELLOR AND THE SPECIAL MASTER BASED THEIR PREVIOUS DECISIONS TO AWARD CUSTODY TO JAMES WILLIAMS?
2) DID THE CHANCELLOR ERR IN ADJUDICATING THE PATERNAL GRANDMOTHER'S RIGHTS OF VISITATION WITHOUT NOTICE TO THE GRANDMOTHER, WHO WAS NOT A PARTY?
3) DID THE CHANCELLOR ERR IN ADMITTING INTO EVIDENCE TESTIMONY AND REPORTS PROCURED THROUGH A MEDICAL WAIVER FROM JAMES, NOT SUPPORTED BY CONSIDERATION, AND NOT VOLUNTARILY AND INTELLIGENTLY MADE, AND WHICH WAS FURTHER REVOKED?
4) DID THE CHANCELLOR ERR IN RESTRICTING THE TESTIMONY OF A SOCIAL WORKER WITH THE DEPARTMENT OF HUMAN SERVICES, AND DID THE LOWER COURT ERR IN REFUSING TO CONSIDER CERTAIN YOUTH COURT RECORDS WHICH ALLEGEDLY FOUND THE MOTHER'S CLAIMS OF ABUSE BY THE FATHER TO BE UNSUBSTANTIATED?
5) DID THE CHANCELLOR ERR IN REFUSING TO INTERVIEW THE CHILDREN AT A CERTAIN POINT AT THE TRIAL, WITH REFERENCE TO STATEMENTS MADE BY THE FATHER TO THE CHILDREN?
6) WAS THE AWARD OF DIVORCE TO SANDRA ON THE GROUNDS OF CRUEL AND INHUMAN TREATMENT *327 AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

II. STATEMENT OF THE FACTS
James married Sandra in January 1982. Two children were born during the marriage, James III, in 1985, and Rebecca, in 1986. Several incidents arose involving the children during the marriage. James destroyed one of the children's toys when his 18-month-old son accidentally damaged a tomato plant. James characterized this action as a visual lesson, and as something he read in child psychology book. Sandra asserted that James had also destroyed two of Rebecca's toys for a similar infraction.
James stated that he used corporal punishment in the past for his children lying or doing dangerous activities by using a paddle on the buttocks.
James stated that in the past the children would be taken to Sandra's mother when both parents were working at 5:00 A.M. Later when Sandra went to work at 3:00 A.M., Hope, Sandra's daughter, would stay with the children to get them to school the next morning. James stated that Sandra did not object to James' mother, Bobbie Williams, babysitting.
Sandra stated that tensions had been great shortly before James' leaving. Sandra described James as violent. He had punched holes in the wall, stating that it was better to hit the wall than Sandra's face. He also choked Sandra in front of the children, and later pushed her against a wall. Sandra also stated that James had pointed a pistol at her face, stating that he came to use the pistol, but would probably go to jail. Sandra stated that she was afraid of him after these incidents. Sandra admitted to actively participating in arguments with James.
James stated that Sandra had avoided him during the marriage. James left the home in June 1991. On October 15, 1991, they filed a joint complaint for divorce. James agreed that Sandra would have custody of the children.
However, Sandra had an affair with a fellow postal worker, on October 26, 1991. Sandra asserted that James had told her the marriage was over when she signed the documents. Sandra attempted to define what she did with her male friend as an accident, not adultery, but James' lawyer confronted her with her admission of adultery, as given in her answers to interrogatories.
James asserted that learning of Sandra's adultery made him change his mind as to whom should have primary custody of the children. James' complaints about Hope's care in getting the children to school led to him taking the children from Sandra in November 1991.
James then withdrew his agreement for an irreconcilable divorce and filed for divorce against Sandra, alleging cruel and inhuman treatment and adultery. He requested permanent and temporary child custody on November 22, 1991. Chancellor Clapp appointed Thomas Zebert as Family Master, with power to hear issues of child custody.
Several facts were presented during the first emergency relief hearing. Sandra testified that she had been depressed, and the children could sense it. James testified that the children seemed nervous and unwilling to visit their mother. James testified that Sandra screamed at and slapped the children.
During James' custody, James' mother would care for the children from seven in the evening until the morning, when the children went to school. However, Sandra described James' mother as violent, discussing an incident in which James' mother fired a gun in the parking lot of the workplace of James' father.
Oleta Mason, Sandra's mother, testified at the first emergency hearing. Oleta stated that James had called her at work, advising her of Sandra's abortion, infidelity, and describing Sandra as "trash." Oleta also testified that she had observed one of the children being coached by James' mother to state falsehoods against Sandra.
Bobbie Williams, James' mother, testified. She denied coaching the children against Sandra. Master Zebert interviewed both children and on December 10, 1991, placed temporary custody in the father with visitation rights in Sandra. Master Zebert also requested counseling with reports from the *328 psychologists to follow. Chancellor Clapp approved this arrangement on February 3, 1992.
Sandra filed her answer on January 29, 1992, to James' complaint for divorce, admitting adultery, and alleging cruel and inhuman treatment by James. She also requested permanent child custody. Several days later, Sandra filed an objection to the Family Master granting child custody to James. The chancellor affirmed the Family Master regarding custody issues.
Dr. Charlton Stanley prepared his counseling report on May 21, 1992, based on an "at length" examination of both James and Sandra. Dr. Stanley found James to be manipulative and self-centered. As for James' mother, James had reported his mother was a psychiatric patient, who had attempted suicide in the past. Dr. Stanley found Sandra to be normal in terms of her psychological makeup, although not a perfect mother. Dr. Stanley found the mother to "probably" be a better parent with which to place the children.
Dr. William Beattie, a clinical psychologist assigned to the children's counseling, found the children to be manipulated and dominated by James and his mother, Bobbie Williams. Although Dr. Beattie found that Sandra was unskilled at parenting and that Sandra was more willing to learn those skills than James. Dr. Beattie recommended placement of the children with Sandra. Given the grandmother's psychiatric state, he also recommended that visitations with James' mother be supervised.
Sandra made another emergency motion to remove the children from James' custody on July 17, 1992. The chancellor heard testimony, both expert and laywitness, of abuse of the children in the father's custody and of the father's lack of parenting skills. Additionally, evidence was presented that James' mother, who was assisting in child care, had been a psychiatric patient herself.
The chancellor ruled to deny the motion, but ordered that the children would either stay with the father or be placed in a foster home of the mother's choosing.
The final hearing for divorce began on September 9, 1992. The first witness called was Shelby Stewart, James III's teacher. She testified that James III was an above average student, making As and Bs, scoring in the 99th percentile in standardized testing.
On adverse examination, as part of James' case, Sandra stipulated as to her act of adultery. Sandra admitted the children were well-behaved and intelligent, even under James' care. Sandra stated that during the marriage itself, Hope and Sandra's parents assisted in child care and in getting them ready for school. Sandra also stated that she and James both did housecleaning.
Dr. Edward Manning, a clinical psychologist, testified that he gave the Minnesota Multiphasic Personality Inventory (MMPI) to James himself, and that the results showed a normal personality. Dr. Manning testified that the children also appeared to be psychologically normal, although concerned about the divorce. Dr. Manning stated that James had the willingness and capacity to provide child care. Dr. Manning did note that James talked negatively about Sandra in his discussions. Dr. Manning observed one instance of coaching the children by James but later stated that he thought the children had not been coached.
James testified that in counseling with Dr. Stanley, which was ordered by Master Zebert, he did not know that he was the subject of psychoanalysis. James stated that he was upset and angry when he took the MMPI for Dr. Stanley. James denied talking negatively about Sandra to the children, but asserted that Sandra had talked negatively about him. James stated that the toy destroying lessons had occurred. James testified that the children are bright and well-behaved and that James III is in the gifted program.
James also testified that Sandra had told the children not to do well in school, because their success would endanger her chances of getting custody. The chancellor found James' testimony on this point to be "outrageous" and unbelievable.
Dr. Stanley, testifying on Sandra's behalf, stated that he tested James twice. The first score tended to show a person with a poorly-developed *329 conscience, and a high-energy score on the mania scale. He indicated this profile reflected a criminal personality. However, Dr. Stanley stated the second test indicated a personality who is authoritarian, rigid, and domineering. Dr. Stanley stated that both tests are valid in their own way. Dr. Stanley opined that Sandra met the Albright v. Albright, 437 So.2d 1003 (Miss. 1983), criteria for parenting better than James.
Dr. Beattie, an expert in child psychology, testified for Sandra. Dr. Beattie stated both children spontaneously said several negative things about their mother, indicating coaching.
Dr. Beattie testified that Sandra had problems in childraising, but had attempted to improve her parenting skills. Dr. Beattie asserted that both children were too young to be away from their mother. Health and gender of the children were not factors. Dr. Beattie opined that Sandra had the better capacity and willingness to parent. Dr. Beattie also asserted that Sandra would be the better custodial parent. Dr. Beattie stated any contacts between the children and James' mother, Bobbie, should be supervised.
Dr. Stanley, on recall, asserted Sandra's willingness and capacity to provide primary child care made Sandra a better choice for parenting. The parties' mental and moral fitness evaluation favored Sandra, since she admitted that she had shortcomings, and James had a type of "moral blindness."
Sandra stated she had read books and attended parenting groups to improve her skills. Sandra stated she was the primary caregiver. Sandra stated that Bobbie Williams has been abusive in manner and in the use of profane language.
Oleta Mason, Sandra's mother, and Bobbie Williams, James' mother, each testified with the same tenor favoring her child's position. Bobbie admitted that she had taken some counseling as an outpatient. Bobbie admitted using profanity against Sandra, but only in retaliation for Sandra's harassment of her.
The chancellor stated that he would await the results of any Youth Court determination on the allegations of mental abuse against the children before making a final determination. The chancellor later received a determination from the Department of Human Services, stating that these charges were unsubstantiated.
Chancellor Clapp issued a final judgment of divorce on January 20, 1993. The chancellor found that Sandra had made "serious errors of indiscretion," including "technical adultery" after their agreement on divorce. The chancellor also found that Sandra was capable of "improving her parental skills," and that James had attempted to turn his children against Sandra, in order to gain custody.
The chancellor noted the psychologist's testimony concerning James and Sandra, combined with apparent programming of James III by his father, as factors in awarding custody to Sandra. The chancellor then analyzed the choice of primary custody based upon Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983), favoring Sandra. The chancellor found that the factors of continuity of care, the capacity and willingness to provide parenting skills, and the mental health of the mother weigh in her favor. The chancellor found that moral fitness weighs in favor of the father, although this factor was not determinative.
The chancellor awarded a divorce upon grounds of adultery against Sandra and upon cruel and inhuman treatment against James. The chancellor also restricted unsupervised visitation between the children and their paternal grandmother, subject to her appearing before the court for such visitation rights.
The chancellor, however, refused to lift the automatic stay of the switch in child custody, arising from M.R.C.P. 62(a). James made a motion for JNOV or new trial on February 1, 1993. The chancellor denied this motion on May 4, 1993. Aggrieved, James filed his notice of appeal on June 1, 1993.

III. ANALYSIS
In light of the first two issues, this Court finds it unnecessary to discuss the remaining issues.

1) WAS THE AWARD OF CUSTODY TO SANDRA WILLIAMS AGAINST THE OVERWHELMING WEIGHT OF THE *330 EVIDENCE, BASED UPON THE SAME TESTIMONY ON WHICH THE CHANCELLOR AND THE SPECIAL MASTER BASED THEIR PREVIOUS DECISIONS TO AWARD CUSTODY TO JAMES WILLIAMS?
The standard of review in child custody cases is quite limited. A chancellor must be manifestly wrong, clearly erroneous, or applying an erroneous legal standard in order for this Court to reverse. See, e.g., Chamblee v. Chamblee, 637 So.2d 850, 860 (Miss. 1994). This Court will affirm decisions of the chancellor, whenever based on credible evidence. Id.
James argues Albright v. Albright, 437 So.2d 1003 (Miss. 1983) criteria in order to have this Court reconsider the chancellor's decision. In addition, James asserts that the mother's alleged psychological coaching supports an award of the children to himself. See Newsom v. Newsom, 557 So.2d 511, 516 (Miss. 1990). However, his argument overlooks the fact that the chancellor found persuasive expert testimony indicating coaching occurring while the children were in James' custody.
Furthermore, credible evidence supports the chancellor's findings. The chancellor clearly followed Albright criteria in making his findings on the record. The chancellor noted that Sandra had greater willingness and capacity to learn proper parenting skills. Expert testimony in the record supported this finding, which indicated Sandra had a willingness to be a better parent. In addition, the chancellor found that James' psychological profile, in addition to programming occurring during James' custody, was persuasive in awarding permanent custody to Sandra. As stated above, programming by one parent is a valid factor in awarding custody. Newsom, 557 So.2d at 516. James' psychological makeup, as a potential detriment to the children, was certainly a valid factor to consider when awarding permanent custody. Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983); see also Newsom v. Newsom, 557 So.2d 511, 517 (Miss. 1990) (holding apparent instability as factor in changing child custody).
The chancellor noted that James was more morally fit, presumably because of Sandra's incident of adultery. This factor was not determinative to the chancellor. The chancellor is correct in not making this factor alone determinative, as this Court has held that an act of adultery is only one factor in determining child custody. Carr v. Carr, 480 So.2d 1120, 1123 (Miss. 1985).
James also argues that since temporary custody went to him, a change in circumstances is necessary to award Sandra permanent custody. However, this Court has previously held that such a burden of proof is unnecessary where permanent custody of the child is not involved. Sistrunk v. McKenzie, 455 So.2d 768, 770 (Miss. 1984). Although visitation rights, as opposed to temporary custody here, was at issue in Sistrunk, this Court holds that the same principle applies here as well. This type activity has not continued.
Since credible evidence and proper legal adherence by the chancellor underlies this ruling, this issue is affirmed.

2) DID THE CHANCELLOR ERR IN ADJUDICATING THE PATERNAL GRANDMOTHER'S RIGHTS OF VISITATION WITHOUT NOTICE TO THE GRANDMOTHER, WHO WAS NOT A PARTY?
In this issue, James asserts that the chancellor's restrictions on Bobbie Williams' visitation with the children is invalid. He notes that Bobbie neither was a party to the case, nor had notice of the impending restriction. He cites caselaw in specific support of this proposition. See Smith v. Watson, 425 So.2d 1030, 1033 (Miss. 1983). He also states that parties have a due process right to defend against restrictions upon their liberties. Morris v. Morris, 359 So.2d 1138, 1139 (Miss. 1978).
This Court agrees that Bobbie's visitation rights should not have been adjudicated, as she was not a party; however, the trial court restricted these parents from granting any unsupervised visitation of the children with the paternal grandmother, and this restriction remains in full force against the parents. The chancellor's ruling left open the availability of addressing grandparents' visitation rights on proper petition.
The granting of the divorce is affirmed; child custody in the mother is affirmed; subject *331 to reasonable rights of visitation in the father under restriction.
JUDGMENT IS AFFIRMED.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.