# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-01717-SCT

*MITZI ANNE POWELL*

*v.*

*CHRISTOPHER M. AYARS, INDIVIDUALLY AND NEXT FRIEND FOR CHAYCE ASHLEY AYARS, A MINOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/1999 |
| TRIAL JUDGE: | HON. FRANKLIN C. McKENZIE, JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | S. CHRISTOPHER FARRIS |
| ATTORNEY FOR APPELLEE: | LEONARD BROWN MELVIN, III |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | REVERSED AND REMANDED - 8/16/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/6/2001 |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. Mitzi Anne Powell appeals the judgment of the Jones County Chancery Court awarding custody of her daughter, Chayce Ashley Ayars, to the child's father, Christopher M. Ayars.

## FACTS

¶2. Christopher Ayars and Mitzi Powell began dating while both were employed at the Junior Food Mart in Hattiesburg, Mississippi. Ayars maintains that prior to Chayce Ashley Ayars's birth, he and Powell agreed that he would have primary custody of Chayce. At trial, Powell admitted telling others that such a "custody agreement" existed; however, she claimed she only made the agreement because of threats made by Ayars. Following her birth, Chayce lived with Powell for approximately one month. Ayars contends that after one month had passed, as per the alleged "custody agreement," he brought Chayce home with him to live on a permanent basis. Ten days later, Ayars allowed Chayce to visit Powell at her home in Seminary, Mississippi. When he returned to pick her up, Powell refused to allow him to take Chayce home with him. Ayars continued to visit Chayce, often at Powell's trailer, until, he maintains, Powell refused to let him see his daughter. Ayars paid Powell child support in the amount of $150 per month, though no court order existed which required him to do so.

¶3. On April 6, 1999, Ayars filed a Complaint for an Order of Filiation, Custody and Child Support in the Jones County Chancery Court. Ayars sought custody of his daughter, along with child support and one-half of her medical and dental expenses. Alternatively, Ayars requested liberal visitation rights. On May 13, 1999, the chancellor entered a temporary order awarding custody of Chayce to Powell and granting Ayars

visitation rights. The chancellor further ordered Ayars to continue paying $150 per month in child support and to provide health insurance for his daughter. On June 9, 1999, Ayars filed a motion for citation for contempt and for temporary custody, alleging that Powell refused to allow him any contact with his daughter. The chancellor issued a temporary order reaffirming the prior order and amending Ayars's visitation rights.

¶4. Following a trial, the chancellor awarded Ayars custody of Chayce. He further ordered Powell to pay child support in the amount of $150 per month and one-half of Chayce's medical expenses. Finally, the chancellor awarded Powell visitation rights.

¶5. In this case, the chancellor stated that he examined the case under *Albright* but he did not make an on-the-record determination of each applicable factor. As a reviewing Court, we require more than merely a chancellor's statement that he took into account all of the *Albright* factors. Because specific findings are vital to this Court's ability to evaluate a chancellor's child custody decision, we reverse and remand for findings consistent with this opinion.

## DISCUSSION

¶6. The standard of review in child custody cases is limited. Reversal occurs only if a chancellor is manifestly in error or applied an erroneous legal standard. *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995). It is for the chancellor to determine the credibility and weight of evidence. *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994).

### I. WHETHER THE CHANCELLOR ERRED IN FAILING TO PROPERLY APPLY THE *ALBRIGHT* FACTORS WHEN HE AWARDED CUSTODY OF A NINE MONTH OLD FEMALE CHILD

¶7. In child custody cases, the best interest of the child must be kept paramount. *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994). The court considers the following factors in determining the child's best interests: (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

¶8. In awarding custody to Ayars, the chancellor focused on specific testimony which undoubtedly reflected poorly on Powell. The testimony related to two of the *Albright* factors, parenting skills and stability of the home environment. The opinion does not discuss specifically the remaining factors, including Chayce's age and sex, continuity of care, and the parties' employment. In light of this Court's precedent regarding the entering of specific findings of fact, we hold this failure to be reversible error.

¶9. In *Hayes v. Rounds*, 658 So.2d 863 (Miss. 1995), we clearly stated that "although the court explicitly acknowledged that the *Albright* factors apply to the present case, it is not clear whether the court properly applied the factors." *Id*. at 865. In *Hayes* this Court further stated, "[w]hile we cannot say that the

chancellor's conclusion is so lacking in evidentiary support as to be manifest error, in the absence of specific findings we cannot affirm with confidence that the best result has been reached." *Id.* at 866. We therefore reversed and remanded. Similarly, in *Louk v. Louk*, 761 So.2d 878 (Miss. 2000), and *Gray v. Gray*, 745 So.2d 234, 240 (Miss. 1999), we reversed and remanded for lack of specificity in utilizing the *Ferguson* factors. Furthermore, in an earlier case, *Tricon Metals & Servs., Inc. v. Topp*, 516 So.2d 236 (Miss. 1987), we held that "in cases of any complexity, tried upon facts without jury, court generally should find facts specially and state its conclusions of law thereon....and failure to make such findings of ultimate fact and conclusions of law will generally be regarded as abuse of discretion" *Id.* at 238-39.

¶10. Most recently, this Court decided *Owen v. Owen*, No. 1999-CA-01077-SCT, 2001 WL 204040 (Miss. Mar. 1, 2001), where we noted that this Court has reversed decisions where, even though the chancellor may have actually applied the *Ferguson* factors, the chancellor failed to make specific findings on the record. *See Kilpatrick v. Kilpatrick*, 732 So.2d 876, 880-81 (Miss. 1999). In *Owen*, reversal was essential as there were clearly more *Ferguson* factors applicable than the one addressed by the chancellor. Although the instant case involves the *Albright* factors, the paramount concern is no different. Our job as a reviewing Court is only to evaluate whether the chancellor's decision was manifestly erroneous based on a proper analysis of each of the applicable *Albright* factors. This task becomes futile when chancellors fail to consider and discuss each factor when rendering decisions.

¶11. Because we refuse to attempt to correspond the *Albright* factors to the evidence found within the record, we remand so the chancellor may make findings on each applicable *Albright* factor. We will, however, review the two factors considered by the chancellor.

### A. Parenting Skills and Willingness and Capacity to Provide Primary Care

¶12. The specific incidents relied upon by the chancellor in awarding custody to Ayars are most closely related to Powell's parenting skills. Lilly Jimenez, a former co-worker of Powell's, stated that she had seen Powell's children at work and "they looked dirty, and they smelled sour . . . ." Other witnesses testified accordingly. Russell Moore, the manager of the Junior Food Mart convenience store where both Powell and Ayars are employed, explained that he saw Powell's children about four or five times and that on each occasion, they were not just dirty but were "ground in dirt." Jessica Utley, who was married to the father of Powell's other children, reluctantly admitted that when the children return from Powell's, they are often dirty. Ayars's sister, who saw Chayce only once, stated that she had "a lot of dirt colored matter behind her ears and between her . . . we took off one of her shoes, and she had some between her toes, and her fingernails were pretty dirty." Finally, Ayars's girlfriend, Jennifer Cooley, claimed that when Powell delivered Chayce to Ayars's apartment for weekend visits, "the child's fingernails were very long, and she had lots of dirt under her fingernails. Her toenails would be very long. There was lots of dirt and grime between her toenails . . ."

¶13. Jimenez further testified that on one occasion, Powell's mother, who babysits Chayce and Powell's two older children while Powell is at work, left Chayce in the car while she entered the bank. Additionally, Moore noted that on one occasion, Powell brought her children with her to work. When he informed her that they could not remain inside the store, she took them outside, presumably, he stated, to leave them in the car while she worked her ten-hour shift. Jessica Utley noted that Powell "cusses the children and cusses in front of them." She qualified her remarks, noting that she had not been around Powell for approximately two years. However, Ayars also stated Powell curses around her children. Finally, Ayars noted that on

each of his visits to Powell's trailer, there were six people residing in it, including Powell's uncle, mother, and brother.

¶14. There is testimony that Powell is not as neglectful as Ayars alleges. James Utley, the father of Powell's older children, testified that Powell was a good parent. His wife testified accordingly. She claimed Powell's older daughter suffered breathing problems until she moved in with her mother and that since she began living with Powell, the daughter's breathing problems have vanished. Leigh Ann Thurman, the girlfriend of Powell's brother, testified that Powell's children are not dirty. She further described activities in which Powell and her children participate, including swimming, riding four wheelers, and canoeing. In addition, Powell's mother stated that her daughter is a good parent and participates in many activities with her children. Finally, Powell denied that her children are dirty and that she is a bad parent.

¶15. Neither party presented much evidence as to Ayars's parenting skills. Powell's cousin testified that on one occasion, Ayars became "hostile" and handed Chayce to her mother in an angry manner. Powell refused to admit that Ayars was a good father and in fact stated her daughter was in danger when she visited Ayars. Powell's mother described Ayars as "aggressive" and "controlling" but related no specific examples of such conduct.

¶16. Lilly Jimenez, however, stated Ayars was a good father who was sometimes even "over protective" of his daughter. Moreover, the program coordinator at the Center for the Prevention of Child Abuse in Hattiesburg, Mississippi, stated that Ayars successfully completed a parenting class. As such, this factor weighs in favor of Ayars, but may be reviewed on remand.

### B. Stability of Home Environment

¶17. In his opinion, the chancellor made express findings as to this *Albright* factor. He stated "[i]t concerns me that apparently in Mitzi's home there is a history of people coming and going. They are relatives. I understand all that, but there's a lot of instability in that environment . . . ." Though Powell denied that anyone other than her mother and two daughters lived with her at the trial, Ayars noted that when he visited the trailer, there were up to six people living there, including Powell's uncle and brother. Ayars testified that Powell, her mother, Powell's older daughter, and Chayce shared one bed.

¶18. The chancellor also focused on the "sewage pit" near Powell's trailer. He remarked, "if we accomplished anything in this case, I guess maybe we got the hole in the yard fixed where the sewer was. I'm not sure about that, but there's been a lot of testimony about that. Of course, that relates to the home environment that this child would be living in . . .." Several witnesses testified about the "large pit of open sewage" located approximately ten feet from Powell's trailer. Ayars explained there was "a five foot hole ten foot away from the door on the outside of the trailer, that was covered up with a car hood at one time." He noted that the hole contained sewage and was below ground level with no barriers around it. Chris Eastburn, a process server, stated "there's a looked like a four by four open pit of black sludge . . . . " He went on to note that there was a "repulsive" odor emanating from the pit. However, Eastburn acknowledged that an individual, later identified as Powell's uncle, informed him he was in the process of "working on my pit." Ayars's sister also testified that the open sewer was covered by a car hood when she saw it and that it smelled offensive. The pit has been repaired, but the chancellor viewed it as indicative of conditions at Powell's residence.

¶19. Moreover, witnesses testified that the area surrounding the trailer was unkempt. Ayars described the

trailer as follows, "[t]he condition of the trailer from outside is reasonable . . . It has a good appearance from the outside. The area around the trailer is quite messy. . . . Appliances, junk is the best term that I can use, is scattered throughout. There's two older trailers, that I do believe are her mother's and her uncle's, that are nearby that are unlivable as far as I am concerned . . . ." Chris Eastburn testified accordingly, noting "[i]t looks like it has never been mowed. Overgrown. I would [not] have even known somebody lived there had not their car parked there. And there was at least three junk cars kind of pushed off to the side. It was like been abandoned and brush grown around to the top of the windows and what have you. . . ." He did note that the inside of the trailer was "orderly but dirty," explaining the carpet was matted and dirty. Ayars's sister offered a similar description, "there was a lot of trash and old appliances out in the yard. I noticed when we went up to the front door there was an open sewer right to the left as you walk in the front door, and it had an old rusty hood on the front laying over it." She also described the odor of animal waste in the house which she presumed emanated from the large number of puppies living under the trailer.

¶20. Powell contended that there were no appliances in front of her trailer but rather were closer to her uncle's trailer, and she denied that any animals were living in her home. Powell explained at trial that as of the previous Saturday, the pit had been repaired. She stated that a concrete "lid" had been placed over it and there were plans to fill it in with dirt. Other witnesses confirmed that the pit had been covered. Christopher Jennings, Powell's cousin, testified the pit had been covered and that the inside of Powell's trailer was clean. Other witnesses offered similar testimony. Powell's mother explained the origins of the open pit, stating "[t]hat pit is there because first of all there was a house there many years ago that belonged to my grandmother. We dug that pit there, and it kind of got lost off after we destroyed the house, and so a friend came by one day and rolled over it with the car, and it broke in two. And so we have been working on it to get it back like it is suppose to be which it's covered."

¶21. Scant evidence was presented at trial regarding the stability of the home environment at Ayars's apartment. He stated he has a two-bedroom apartment where Chayce has her own bedroom. Photographs of the bedroom were admitted into evidence.

¶22. These two factors, parenting skills and stability of the home environment, were the only two factors fully analyzed by the chancellor on the record. While those factors appear to weigh in favor of Ayars, we as a reviewing court cannot be secure in affirming or reversing a case on the issue of child custody until we are satisfied that the evidence has been properly weighed according the specific guidelines set forth in *Albright*.

### II. WHETHER THE CHANCELLOR FAILED TO MAINTAIN NEUTRALITY DURING THE HEARING AND AT TIMES, APPEARED TO BE CO-COUNSEL FOR CHRISTOPHER AYARS

¶23. Powell cites several instances during trial where the chancellor asked questions of witnesses. She claims that by doing so, the chancellor became "co-counsel for Ayars" and denied her a fair trial.

### A. Jessica Utley

¶24. Powell contends that during the trial, the chancellor "repeatedly rehabilitated and/or cross-examined witnesses." On one occasion, Jessica Utley expressed concern about testifying because she did not want to harm her relationship with Powell. This prompted the chancellor to question Utley about her contact with Powell regarding her testimony. Utley admitted phoning Powell and telling her what questions might be asked of her and her proposed answers. When asked by the chancellor why she phoned Powell, Utley

responded, "I didn't want her to be mad at me for coming today."

## B. Christopher Ayars

¶25. During cross-examination of Ayars, Powell's attorney asked him about his duties as manager of the Junior Food Mart, namely the fact that he is on call twenty-four hours each day. Ayars stated that he was on call but that he also has other employees who may assist him. After the attorneys completed examination of Ayars, the chancellor questioned him about the circumstances under which he might be called to the store.

## C. James Utley

¶26. Powell also complains about the chancellor's questioning of James Utley, the father of Powell's older children. After Utley testified about his good relationship with Powell, the chancellor asked "If y'all were getting along so fine, why are you not still living with her?" When Utley stated that they did not get along while they were living together, the chancellor asked Utley to give him an example of something about which the couple might argue. The chancellor also asked Utley questions about his children with Powell. They lived with Utley after they separated, and later the daughter went to live with Powell.

## D. Christopher Jennings

¶27. Powell's cousin, Christopher Jennings, testified that he and Powell passed Ayars while traveling to Hattiesburg and that Ayars "liked to run us off the road." The chancellor asked Jennings what he meant, to which Jennings responded that Ayars was "[j]ust driving crazy." The chancellor informed the witness, "[w]ell you gone [sic] have to describe what happened. You just going to have to tell what he did. Don't be using terms like 'driving crazy' or 'like to have run us off the road.' You're going to have to tell me what happened." After the witness gave inconsistent versions of the events, the chancellor stated, "I asked which was it? Was he coming at 'em, driving them, or was he behind them? That's what I want to know. It seems to me it would be a pretty simple question. For a traumatic event like that, somebody ought to be able to remember whether he was coming toward me or coming behind me. . . ." When Powell's attorney asked the witness,"where did he swerve at you? How did he swerve at you?", the witness failed to respond, and the chancellor remarked "Lengthy pause."

## E. Steve Smith

¶28. Finally, Steve Smith, a friend of Powell's, testified that on one occasion, Ayars became angry while holding the baby and handed her to Powell in a hostile manner. After Powell's attorney asked the witness "[h]e shook the baby?", Ayars's attorney objected. The chancellor sustained the objection, stating "[y]ou don't have to show us what he did. All you need to do is tell us what happened." Smith then remarked "he handed the baby to her like that. That's the best way I can put it."

¶29. Mississippi Rule of Evidence 614(b) specifically provides that the "court may interrogate witnesses, whether called by itself or by a party." However, it is grounds for reversal if the trial judge abuses the authority to call or question a witness by abandoning his impartial position as a judge and assuming an adversarial role. *West v. State*, 519 So. 2d 418, 422-24 (Miss. 1988). In order to obtain a review of the question of propriety of remarks or conduct of the judge during a trial, the remarks must be especially called to the attention of the trial judge when made, and a correction requested or a proper objection made at the time. *Tippitt v. Hunter*, 205 So. 2d 267, 271 (Miss. 1967). A limitation on this rule occurs when

"the conduct of the trial judge, on the entire record, was so reprehensible and prejudicial as to deny a fair trial or due process of law." *Jackson Yellow Cab Co. v. Alexander*, 246 Miss. 268, 277, 148 So. 2d 674, 678 (1963).

¶30. This Court has listed some of the circumstances under which a trial judge may question witnesses, explaining:

> There is the frightened or excited witness to whom, by a few discreet and sympathetic interrogatories by the court, normal mental processes may be restored; there is the recalcitrant, stubborn, or extremely partisan witness upon whom it may become necessary to place the power of the court itself in order to make the witness disgorge all, instead of only a part, of the material facts actually known to him; there is a witness whose testimony is confused and in a fog, and counsel either fails to clear it up with reasonable promptness or, as often happens, adds to the confusion by a confused course of examination . . . .

*Griffin v. State*, 171 Miss. 70, 156 So. 652, 653 (1934). The Court further noted that the powers of a chancellor are broader than those of a circuit judge when he sits as both judge and jury. *Id.*

¶31. Powell contends that she did not receive a fair trial as a result of the chancellor's behavior. She complains that the chancellor impeached the Utleys when they attempted to testify in her favor. Powell further argues that the chancellor attempted to rehabilitate Ayars after he admitted he is on call twenty-four hours a day. She notes that the chancellor "actually tried Christopher Jennings" after he recalled the incident in which Ayars allegedly ran him off the road and engaged in a "blistering diatribe and cross-examination . . . ." Lastly, Powell argues that the chancellor prohibited Steve Smith from physically demonstrating the manner in which Ayars angrily handed the baby to Powell when there was no objection to his doing so.

¶32. At trial, Powell failed to object to any of the aforementioned questions asked by the chancellor. She may not object to them for the first time on appeal. While it appears that the chancellor tread closely along the line between adversary and impartial factfinder, we hold that this issue is without merit. Though there is an exception to the procedural bar, it is limited to instances in which the chancellor's conduct was so reprehensible so as to deny a party a fair trial. *Jackson Yellow Cab Co. v. Alexander*, 148 So. 2d at 678. That is not found in this case.

## CONCLUSION

¶33. A determination of child custody will be held erroneous where a chancellor is not thorough in his discussion, factor by factor, of *Albright*. Here, the chancellor did not make specific findings for each factor. Therefore, the judgment of the Jones County Chancery Court is reversed, and this case is remanded for findings consistent with this opinion.

¶34. **REVERSED AND REMANDED.**

**BANKS, P.J., SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶35. I write separately because I would affirm the chancellor in this case and note that he has stated that he has followed and considered the *Albright* factors. In *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), we instructed chancery courts to consider several factors in determining the best interests of the child, stating the oft-cited principle that "the polestar consideration in child custody cases is the best interest and welfare of the child." *Id.*

¶36. Furthermore, we have never held that chancellors must enunciate findings upon each and every factor to determine the best interest of the child. *Sobieske v. Preslar*, 755 So. 2d 410, 413 (Miss. 2000). *See also Lackey v. Fuller*, 755 So. 2d 1083, 1090 (Miss. 2000) (McRae, J., dissenting). Some factors do not apply in every case. Chancellors should not be under the burden of making findings as to each and every *Albright* factor because these are simply factors to be considered, not requirements to be met. If a chancellor states in the record that he has considered the *Albright* factors and if we can glean from the record substantial facts to support these factors, why require a chancellor to make a formal opinion on each and every factor? If the proof is in the record to uphold the chancellor, then this is sufficient. To require the chancellor to put these findings into a formal opinion that the child can get later and read may not be in the best interest of the child. Some evidence is best left in the record for us to glean.

¶37. The question that remains is, why are we forcing chancellors to make our jobs easier on the few cases that are appealed to this Court? Many domestic cases deal with this very issue, but a limited number are appealed to this Court. Requiring chancellors to make an on-the-record finding of each factor stands in the way of judicial economy and delays parties in their attempts to resolve child custody issues. Requiring chancellors to make findings on each and every factor in anticipation of an appeal does an injustice to the parties in these cases.

¶38. Why make such a ruling that makes a chancellor's job more difficult? A chancellor can disseminate his rulings from the bench as to the relevant and applicable factors, but our ruling today forces child custody cases below to be delayed, while the chancellors go back, dictate their findings upon each and every *Albright* factor, and have these findings transcribed, just to meet our heavy burdens for review. This Court can easily glean from the record whether the *Albright* factors have been considered and whether the facts of the case support the chancellor's findings.

¶39. As we have stated in *Albright*, *supra*, the best interest and welfare of the child, and not each of these factors, are the primary considerations in a child custody case. Requiring chancellors to put evidence of each and every factor into the record or an opinion may not be in the best interest of the child. Some factors, while in the record, do not have to be put in the opinions because the opinions are a part of the file, and children sometimes have a chance to read the file at a later date or one parent can show the child what a chancellor said about the other.

¶40. As the majority states, reversal occurs only if a chancellor is manifestly in error or applied an erroneous legal standard. *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995). Further, we stated that, "this Court will affirm decisions of the chancellor, whenever based on credible evidence." *Id.* (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994)). In this case, the chancellor has not committed manifest error because he did in fact consider the *Albright* factors, and the record supports it. Under the above standard of review, I would affirm the chancellor; and therefore, I dissent.

**DIAZ, J., JOINS THIS OPINION.**

**DIAZ, JUSTICE, DISSENTING:**

¶41. Although I agree with much of the majority's analysis, I write separately because I would have reached a different conclusion. I do not object to requiring chancellors, in the future, to make an on-the-record determination for each *Albright* factor. However, despite the majority's allusions to the contrary, we have never before mandated that chancellor's undertake this task, and I feel the retroactive application of such a rule is unwarranted, especially in the present case. In the matter at hand, the chancellor stated that he examined the case under *Albright*, and there exists ample evidence in the record to support the chancellor's ruling. Since we have never required chancellors to make on-the-record findings for each factor, I feel the absence of such findings does not warrant remanding the matter. *Sobieske v. Preslar*, 755 So. 2d 410, 412 (Miss. 2000). *Albright* specifically states these were merely "factors to be considered" and "the polestar consideration in child custody cases is the best interest and welfare of the child." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). In addition, there is evidence in the record which indicates the chancellor properly awarded custody to Ayars. Accordingly, I believe we should affirm the chancellor's holding.

¶42. Although he failed to review each factor on the record, the chancellor recognized the *Albright* factors in his oral opinion. In the instant case, the chancellor did declare his reliance on the *Albright* factors in making his decision, stating "[t]he Court while listening to the testimony in this case has viewed that testimony in line with these factors and has considered these factors." We take chancellors at their word and will not reverse unless the decision is shown to be manifestly erroneous. *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995). The chancellor's opinion does not discuss specifically the factors of Chayce's age and sex, continuity of care, and the parties' employment. However, we are able to piece together an analysis of the *Albright* factors that strongly suggests the chancellor correctly awarded custody of Chayce to Ayars. Upon remand, the chancellor will simply reiterate the following which is already in the record:

### A. Age, Health and Sex of the Child

¶43. Chayce is female and was born in December of 1998. This Court in the past has held that if the mother of a child of tender years is fit, then she should have custody. *Law v. Page*, 618 So. 2d 96, 101 (Miss. 1993). However, the age and sex of a child are merely factors to be considered under *Albright*, and this Court has significantly weakened the once strong presumption that a mother is generally best suited to raise a young child. In *Mercier v. Mercier*, 717 So. 2d 304, 307 (Miss. 1998), we held that the tender years doctrine has been gradually weakened in Mississippi jurisprudence to the point of now being only a presumption.

¶44. As for Chayce's health, Powell testified that following a July 1999 doctor visit, the physician determined Chayce was healthy. Powell sought to substantiate this claim by attempting to introduce medical records into evidence but the chancellor refused to admit those records. There was no other conclusory evidence regarding Chayce's health.

### B. Continuity of Care

¶45. Except for an approximately ten-day stay with her father one month after her birth, Chayce has lived with Powell. Ayars visited his daughter at Powell's trailer two or three times each week until February of 1999 when Powell refused to allow him any further visitation. Evidence shows Powell has continuously cared for Chayce only because she reneged on the parties' "custody agreement." If the single factor at issue

here is who was the child's primary care giver in the past, this factor favors Powell. However, generally a person is not rewarded for his/her improper acts; Ayars should not be penalized for not being able to care for his child when he could not actually be with her.

### C. Employment

¶46. This factor does not clearly favor either parent. Both Ayars and Powell are employed at Junior Food Mart in Hattiesburg. Powell works as a cashier and earns approximately $228 per week. Though the record was somewhat unclear on this point, she works four days and then is off for three days. While Powell is at work, her mother babysits Chayce, a service for which Powell pays her $200 each month.

¶47. Ayars is a manager at Junior Food Mart whose weekly net income is $300. He works 8:00 a.m. to 4:00 p.m., but he is on call twenty-four hours a day and must return to the store in case of an emergency. He stated that Chayce would remain in daycare while he is at work. Ayars claimed that if an emergency arose and he had to return to the store at night, he has an "array" of friends who could watch Chayce, including his girlfriend, his girlfriend's mother, and his landlords. Ayars is attempting to complete his degree in music education at the University of Southern Mississippi.

¶48. Because Ayars is on-call and could be required to return to the store at any time, the chancellor could have found that this factor weighs in favor of Powell. However, at trial, the chancellor expressed concern over the care provided by Powell's mother, who babysits Chayce while Powell is at work. Unless manifestly in error, we will not disturb the chancellor's findings. *Williams*, 656 So. 2d at 330. Thus, this factor favors Ayars.

### D. Physical and Mental Health and Age

¶49. Powell is thirty years old while Ayars is twenty-eight. Additionally, there was no indication at trial that either is in poor health. This factor favors neither party.

¶50. The parties' mental health was not an issue at trial, though Powell's testimony regarding a psychic and her possible motives in seeking custody of her child could have some bearing on this issue.

### E. Emotional Ties

¶51. There was no evidence presented on this factor. On appeal, Powell maintains that because she has had primary care of Chayce since birth, this factor is presumed to weigh in her favor. Ayars, however, points to the fact that he visited his daughter at Powell's trailer under "uncomfortable circumstances" and when he was denied access to his daughter, he sought custody and/or visitation in the courts.

### F. Moral Fitness

¶52. Witnesses testified that Powell curses around her children. Further, there was some suggestion by Ayars's attorney that Powell "partied" and had many visitors at her trailer. However, no concrete evidence to support this assertion was offered.

¶53. Ayars's girlfriend admitted that she sometimes spends the night at Ayars's apartment and has done so when Chayce was present. Cohabitation is relevant only to the extent it can be shown to affect the child adversely. *Cheek v. Ricker*, 431 So. 2d 1139,1144 (Miss. 1983). There was no such showing. This

factor does not weigh against either party.

### G. Home, School and Community Record

¶54. Chayce was only nine months old at the time of trial. Therefore, this factor is inapplicable.

### H. Preference of the Child

¶55. This factor is inapplicable because of Chayce's young age.

¶56. Thus, as the majority points out, two of the factors, parenting skills and stability of the home environment, weigh in Ayars's favor, so much so that they were the only two factors fully analyzed by the chancellor on the record. Of the remaining factors, none, with the possible exception of continuity of care, favors Powell. Employment does not clearly favor either party. Ayars is on-call twenty-four hours each day and is subject to being called to the Junior Food Mart in case of an emergency. However, Powell leaves Chayce in the custody of her mother while she is at work each day. In his opinion, the chancellor expressed concern about the care provided by Powell's mother. The remaining factor which has applicability in the instant case is the age and health, both physical and mental, of the parties. Both parties are approximately the same age and in good physical health, and no solid evidence was introduced questioning either's mental stability.

¶57. The chancellor did not err in awarding custody of Chayce to Ayars and applied the *Albright* factors in rendering his decision. Since the chancellor's decision has not been shown to be manifestly erroneous, the case should be affirmed. *Williams*, 656 So. 2d at 330.

¶58. In the present case, the chancellor applied the proper legal standard and thoroughly examined the situation. Although he did not make specific findings for each factor, we have never before required chancellors to make on-the-record findings. The chancellor declared his reliance on *Albright*, and there is evidence in the record which supports the chancellor's decision. Therefore, retroactively requiring the chancellor to make an on-the-record determination for each *Albright* factor is unnecessary. As such, I would affirm the chancellor's decision and mandate that future cases contain on-the-record findings.

**EASLEY, J., JOINS THIS OPINION.**