# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CT-01162-SCT

*EKATERINA V. BLAGODIROVA*

*v.*

*JOSE C. SCHROCK*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/14/2020 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| TRIAL COURT ATTORNEYS: | JASON D. HERRING |
| | JAK McGEE SMITH |
| | THOMAS M. BRAHAN |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAK McGEE SMITH |
| ATTORNEYS FOR APPELLEE: | JASON D. HERRING |
| | MICHAEL SPENCER CHAPMAN |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE MONROE COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED - 08/10/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. This certiorari case considers the modification of child custody. Because we find substantial evidence in the record to support the chancellor's modification of custody, we reverse the decision of the Court of Appeals and reinstate and affirm the judgment of the Monroe County Chancery Court.

**FACTS AND PROCEDURAL HISTORY**

¶2. Katy Blagodirova and Jose Schrock married in November 2006 and had one child, J.R.,[1] in October 2007. In 2013 the couple filed a joint complaint for divorce on the grounds of irreconcilable differences. The divorce agreement provided that Blagodirova had primary physical custody of the child subject to Schrock's visitation. Schrock agreed to pay $500 monthly in child support payments.

¶3. Following the divorce, Blagodirova began a romantic relationship with Andres Maldonado De La Rosa (Maldonado), J.R.'s soccer coach and an undocumented immigrant. *Blagodirova v. Schrock*, No. 2020-CA-01162-COA, 2022 WL 16568602, at *1 (Miss. Ct. App. Nov. 1, 2022). Blagodirova and Maldonado married in August 2014. Although Blagodirova and Maldonado divorced in April 2015, Maldonado continued to live in Blagodirova's home. Blagodirova claimed an unknown immigration attorney had advised them that a divorce would help Maldonado resolve his immigration status. Having not resolved Maldonado's immigration status, the couple later remarried in September 2018.

¶4. Blagodirova had been working as a registered nurse for a year and a half, working the night shift fourteen days per month from 7:00 p.m. to 7:30 a.m. *Id.* at *2. While she worked, she entrusted Maldonado to care for and transport J.R. to school and to his extracurricular activities. *Id.*

---

[1] For consistency with the opinion of the Court of Appeals and the protection of the identity of the minor child, we use initials.

¶5. Maldonado testified that after remarrying Blagodirova, he obtained an illegal Illinois driver's license to drive J.R. around. He stated that Blagodirova knew he had obtained an illegal driver's license although Blagodirova testified that she did not know it was illegal. Blagodirova has not provided alternatives for childcare for J.R. and instead relies on Maldonado to care for J.R. despite her awareness that Maldonado could be taken into custody and deported again. *Id.* at *9 (Carlton, P.J., concurring in part and dissenting in part).

¶6. In June 2018, Schrock filed a complaint for modification of custody. Schrock requested physical custody of J.R. and the termination of his child support obligation. He alleged that there had been a material change in circumstances adverse to the best interests of J.R. Blagodirova filed an answer and countercomplaint, requesting that Schrock's child support payments be increased. *Id.* at *1.

¶7. During the course of discovery, allegations of abuse and neglect were raised. A guardian ad litem was appointed for the limited purpose of investigating the allegations. The GAL's report and recommendation was that no abuse or neglect of the child had been demonstrated. *Id.* at *2.

¶8. The chancery court entered its Opinion and Final Judgment finding that the "totality of the circumstances constitutes a material, substantial and adverse change in circumstances regarding the child" and, as such, a modification of custody was warranted. After weighing

the ***Albright***[2] factors, the court granted Schrock primary physical custody of J.R., subject to Blagodirova's visitation. Blagodirova was ordered to pay $590 per month in child support.

¶9.     Blagodirova appealed. The Court of Appeals held that "the chancery court manifestly erred by modifying custody based on the finding of an adverse effect on the child." ***Id.*** at *8. Judgment was reversed and rendered in favor of Blagodirova. Schrock sought rehearing, which the Court of Appeals denied. He then petitioned for writ of certiorari, which this Court granted.[3]

## STANDARD OF REVIEW

¶10.    "The standard of review in a child custody case is quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse." ***Wright v. Stanley***, 700 So. 2d 274, 280 (Miss. 1997) (citing ***Williams v. Williams***, 656 So. 2d 325, 330 (Miss. 1995)). "If there is substantial evidence in the record to support the chancellor's findings of fact, no matter what contrary evidence there may also be, we will uphold the chancellor's decision." ***Bower v. Bower***, 758 So. 2d 405, 412 (Miss. 2000) (citing ***Wright***, 700 So. 2d at 280). This Court is "required to respect

---

[2] ***Albright v. Albright***, 437 So. 2d 1003 (Miss. 1983).

[3] On July 25, 2023, Blagodirova filed a motion to dismiss suggesting mootness of the matter before this Court. According to her motion and attached affidavits, Schrock permitted J.R. to permanently live with Blagodirova, so Blagodirova contends that the question of child custody is moot. On July 27, 2023, Schrock responded, disagreeing that the matter should be dismissed or is moot.  We deny the motion to dismiss. On August 2, 2023, Blagodirova filed a motion for leave to modify custody in the lower court. We deny the motion.  Any further modifications to custody shall be handled in the chancery court.

4

the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." ***Rogers v. Morin***, 791 So. 2d 815, 826 (Miss. 2001) (quoting ***Newsom v. Newsom***, 557 So. 2d 511, 514 (Miss. 1990)).

## DISCUSSION

¶11.     "In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change in custody." ***Mabus v. Mabus***, 847 So. 2d 815, 818 (Miss. 2003) (citing ***Bubac v. Boston***, 600 So. 2d 951, 955 (Miss. 1992)).

¶12.     "To justify changing or modifying an original divorce decree, there must be a material or substantial change in the circumstances of the parties." ***Tingle v. Tingle***, 573 So. 2d 1389, 1391 (Miss. 1990). "Before custody should be changed, the chancellor should find that the overall circumstances in which a child lives have materially changed and are likely to remain materially changed for the foreseeable future[.]" ***Giannaris v. Giannaris***, 960 So. 2d 462, 467 (Miss. 2007) (emphasis omitted) (quoting ***Tucker v. Tucker***, 453 So. 2d 1294, 1297 (Miss. 1984)). The totality of the circumstances must be considered. ***Kavanaugh v. Carraway***, 435 So. 2d 697, 700 (Miss. 1983).

¶13.     The chancery court determined that there had been a material change in Blagodirova's overall living conditions since the divorce decree for the following reasons:

> (1) Blagodirova married Maldonado, an undocumented immigrant who illegally entered the United States; (2) Blagodirova has provided Maldonado

5

with a place to live since he was deported to Mexico but illegally re-entered the United States; (3) Maldonado obtained an illegal Illinois driver's license; (4) Blagodirova preferred for J.R. to stay with Maldonado while she was away from home; (5) twenty or more dogs were in Blagodirova's home; (6) Blagodirova placed J.R. in extracurricular activities that he was not interested in, such as boxing; and (7) J.R. preferred to live with Schrock.

*Blagodirova*, 2022 WL 16568602, at *3.

¶14. The Court of Appeals agreed that Blagodirova's actions constituted a material change in circumstances and stated that while, typically, "remarriage itself does not constitute a material change in circumstances that would justify a change of custody," *Robison v. Lanford*, 841 So. 2d 1119, 1123 (Miss. 2003) (citing *Allen v. Allen*, 243 Miss. 23, 33, 136 So. 2d 627, 632 (1962)), this is not simply remarriage.

¶15. Blagodirova had married, divorced, and remarried Maldonado, an undocumented immigrant. Blagodirova knew from the beginning of their relationship that Maldonado was undocumented and continually provided him residence. Blagodirova visited Maldonado in Mexico after he was deported, and he resumed living with them when he illegally returned.

¶16. The material change of circumstances is not disputed; rather, what is disputed is whether that material change adversely affected J.R. "Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children." *Spain v. Holland*, 483 So. 2d 318, 320 (Miss. 1986). "While numerous factors may go into the initial consideration of a custody award," *Morrow v. Morrow*, 591 So. 2d 829, 833 (Miss. 1991), "[i]t is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-

6

being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody." ***Ballard v. Ballard***, 434 So. 2d 1357, 1360 (Miss. 1983).

¶17.   The Court of Appeals held that the facts do not support an adverse effect as "no credible evidence showed how Blagodirova's knowledge of Maldonado's undocumented status or her decision to provide him a home harmed J.R.'s emotional well-being." ***Blagodirova***, 2022 WL 16568602, at *5. The Court of Appeals held that the chancellor did not clearly state how J.R. was adversely affected. ***Id.*** We disagree.

¶18.   The chancellor issued a detailed thirty-page opinion on the matter that includes discussion specifying the adverse effect. When discussing whether there was an adverse effect, the chancery court first noted that Blagodirova's employment, while an "otherwise positive development[,] takes on an adverse complexion because of [Blagodirova's] complete reliance on [Maldonado]." Maldonado provided a significant amount of care to J.R., but his "pattern of conduct [was] not supportive of a positive environment." The chancellor then detailed the behavior and several incidents to support this finding.

¶19.   While "[a]n isolated incident, e.g., an unwarranted striking of a child, does not in and of itself justify a change of custody[,]" ***Tucker***, 453 So. 2d at 1297, these are not isolated incidents.

¶20. Maldonado was driving with Blagodirova and J.R. in the vehicle when they were stopped at a roadblock. Maldonado did not have a license and was subsequently arrested and deported to Mexico. J.R. testified that he was scared when Maldonado was arrested.

¶21. J.R. also testified that Blagodirova had instructed him not to tell Schrock about Maldonado's arrest and deportation and that, if asked, he was to tell Schrock that Maldonado was out of town. The child testified that he felt like Blagodirova was teaching him to lie. Blagodirova admitted instructing J.R. not to tell his father about the deportation and other things, but she said doing so was about privacy and denied telling the child to lie.

¶22. Within two months of the deportation, Maldonado illegally returned to the country and resumed living with Blagodirova and J.R. No evidence or testimony was offered that the couple intended to resolve Maldonado's status as an undocumented immigrant. Blagodirova acknowledged that Maldonado could be arrested and deported again at any time.

¶23. It was further developed at the hearing that Maldonado had illegally obtained an Illinois driver's license. He testified that Blagodirova knew that he was obtaining the driver's license so that he could drive J.R. around without being deported. *Blagodirova*, 2022 WL 16568602, at \*9. The chancery court pointed out that the marriage between Blagodirova and Maldonado and the Illinois driver's license indicated that there was no intention to change the circumstances and that Blagodirova and Maldonado intended for Maldonado stay indefinitely. This Court has previously ruled that "cavorting with a known illegal immigrant with full knowledge of his status" is conduct that is detrimental to the child's best interest. *Garner v. Garner*, 283 So. 3d 120, 130 (Miss. 2019).

¶24. Testimony was given regarding an incident at Walmart. It was undisputed that J.R. was upset and had thrown a fit when he and Maldonado were leaving Walmart. J.R. testified that Maldonado hit him on the chest and then rubbed his hand in J.R.'s face. This resulted in a bloody nose.

¶25. It was also alleged that Maldonado, while driving on the Natchez Trace with Blagodirova in the passenger seat and J.R. in the backseat, became enraged and began to drive erratically. J.R. testified that Blagodirova and Maldonado had been fighting and that Blagodirova had warned Maldonado that J.R. would tell Schrock. While fighting, J.R. said that his mother had also mentioned divorce to Maldonado. Maldonado braked before accelerating and swerving. J.R. testified that he was scared. Blagodirova testified that the couple had been fighting and screaming at each other and that both she and J.R. were upset.

¶26. The chancellor used the examples of Maldonado's harsh treatment of J.R., namely the Walmart incident and the Natchez Trace incident, Maldonado's arrest in front of J.R., the unresolved immigration status, and the urging of the child not to disclose information to Schrock to illustrate that there was a pattern of conduct adversely affecting the child.

¶27. While any of these examples alone would arguably be an isolated incident, the totality of the circumstances shows a pattern, one which the chancellor, by virtue of her position in the courtroom and hearing all of the evidence presented, is in the best position to determine. "The chancellor, by [her] presence in the courtroom, is best equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Rogers*, 791 So. 2d

9

at 826 (internal quotation marks omitted) (quoting *Carter v. Carter*, 735 So. 2d 1109, 1114 (Miss. Ct. App. 1999)).

¶28. Each of these examples is also connected wholly with the presence of Maldonado in the home of Blagodirova. As the chancellor stated, the "overall circumstances in this case produced to a large degree by [Blagodirova's] relationship with [Maldonado] are adverse to the child."

¶29. The chancery court further cited other "instances of [Maldonado's] troubling manner toward the child." While not explicitly discussed in the section about the adverse effect, the chancellor described testimony of Maldonado's name-calling and belittling J.R. and Maldonado's interfering with the child's relationship with Schrock.

¶30. J.R. testified that Maldonado called him names like "fat" and "stupid." The child stated that he did not like the name calling and found it offensive. Maldonado denied calling J.R. names but acknowledged making comments urging J.R. to work out and to lose weight.

¶31. Schrock testified that Maldonado had interfered in the custody arrangement when Blagodirova went to Costa Rica. Blagodirova did not inform Schrock of her travels, and J.R. disclosed to Schrock during visitation where she had gone. Schrock informed Maldonado that he wanted to keep J.R. with him until Blagodirova returned. Maldonado called the police that weekend, but J.R. was permitted to stay with Schrock. Later in the week, Maldonado went to the school with the custody papers, and Schrock was unable to pick up J.R. after school. Maldonado consequently kept J.R. while Blagodirova was out of the country.

Blagodirova expressed displeasure with the child staying with Schrock when she was unavailable.

¶32. The Court of Appeals relied on ***Butler v. Mozingo***, 287 So. 3d 980 (Miss. Ct. App. 2019). In ***Butler***, a father had petitioned for custody, and the court found that there had been a material change. The Court of Appeals, however, found that there was no adverse effect because the "evidence adduced at trial [ran] counter to such a determination: . . . [the child] was in "good health," "active," and "bright." ***Id.*** at 984. ***Butler*** is similar to the present case in that they both involve children that were healthy and doing well in school. These cases, however, can be distinguished by the fact that there was substantial evidence showing an adverse effect on J.R.

¶33. "A child's resilience and ability to cope with difficult circumstances should not serve to shackle the child to an unhealthy home, especially when a healthier one beckons." ***Riley v. Doerner***, 677 So. 2d 740, 744 (Miss. 1996). Schrock acknowledged that Blagodirova has seen to the child's education and that J.R. has received good grades. It was further established that the child was healthy, well-mannered, and bright.

¶34. But good grades and good health do not detract from the fact that the child has received harsh treatment from Maldonado, the child has watched Maldonado be arrested, and the child is transported by Maldonado, who does not have a valid driver's license and could be arrested and deported at any time. The fact that it has already happened, coupled with the possibility of its happening again, constitutes an adverse effect on the child.

11

¶35. Additionally, J.R. testified twice in court that he wanted to live with Schrock but had previously told the GAL and his mother's attorney that he wanted to live with Blagodirova because he was afraid she would be upset or stop talking to him, which J.R. said Blagodirova had done before. J.R. further testified that his mother told him that if he chose Schrock in court, she would move to Florida. Blagodirova denied telling the child she would move and testified that she has no connections to Florida whatsoever.

¶36. The court found that J.R., at twelve years old, was competent to testify. *Blagodirova*, 2022 WL 16568602, at *3. The chancellor stated that she had "personally observed the child's testimony on two occasions . . . and found the child's testimony to be genuine and highly credible." As noted by the chancellor, the Court does not "require the observations of third parties to assist in ascertaining the credibility of the child."

¶37. Substantial evidence supported a ruling that there was a material change of circumstances adversely affecting the child. When reviewing a chancellor's decision regarding child custody, "the chancellor has the ultimate discretion to weigh the evidence the way [she] sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 101-143 (Miss. 2003).

¶38. The chancellor was persuaded by the testimony and evidence presented that the child had been adversely affected. "That power lies with the chancellor alone, who sat as the fact-finder and heard the testimony firsthand." *Irle v. Foster*, 175 So. 3d 1232, 1238 (Miss. 2015). We find that the chancery court properly held that the material change in circumstances adversely affected J.R.

¶39. The last consideration in a modification of custody is that the child's best interest mandates a change in custody. The Court of Appeals did not address this element because it found that the material change in circumstances did not have an adverse effect on J.R. A material change in circumstances that has an adverse effect on the child is a condition precedent to reweighing the *Albright* factors. *Giannaris*, 960 So. 2d at 468.

¶40. Because we find, however, that there was substantial evidence to support the chancellor's finding that there was a material change of circumstance adverse to the child, the chancellor's application of the *Albright* test was appropriate here.

## CONCLUSION

¶41. We find that the chancellor's decision to modify child custody is supported by substantial evidence. Therefore, we reverse the decision of the Court of Appeals and reinstate and affirm the chancery court's modification of child custody.

¶42. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE MONROE COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**

13