918 So.2d 747 (2005)
Pamala Ann Standish ADCOCK, Appellant,
v.
Christopher Alan VAN NORMAN, Appellee.
No. 2002-CA-02027-COA.
Court of Appeals of Mississippi.
March 22, 2005.
Rehearing Denied May 24, 2005.
*750 Patricia Peterson Smith, attorney for appellant.
Sarah A. Hodnett, attorney for appellee.
Before BRIDGES, P.J., GRIFFIS and ISHEE, JJ.
GRIFFIS, J., for the Court.
¶ 1. Pamala Ann Standish Adcock ("Pamala") and Christopher Alan Van Norman ("Christopher") appeal a chancellor's judgment on a petition for custody and a petition for paternity. The chancellor granted Pamala permanent custody of the children, denied Christopher's petition for custody and denied Pamala's request for attorney's fees.
¶ 2. On appeal, Pamala asserts the following errors: (1) the chancellor erred in denying attorney's fees; (2) the chancellor erred in denying attorney's fees and sanctions under the Mississippi Litigation Accountability Act; (3) the chancellor used an erroneous standard to determine custody; and (4) the chancellor demonstrated a clear bias against Pamala. Christopher cross-appeals on the issue of the standard used to by the chancellor to determine custody. We affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

FACTS
¶ 3. Pamala and Christopher met in December of 1999. Pamala was pregnant with twins. Christopher testified that Pamala informed him of the pregnancy on December 31, 1999, which was several weeks into the relationship. They agreed that their sexual relationship began on December 31, 1999.
¶ 4. On January 3, 2000, Christopher accompanied Pamala on a doctor's appointment. They viewed a sonogram, and they saw the twins. Christopher promised to support Pamala, and they continued their relationship throughout her pregnancy.
¶ 5. Pamala and Christopher never married. The twins, Shane Anthony Van Norman and Hopelynn Nicole Van Norman, were born premature on May 3, 2000. On May 4, 2000, Pamala and Christopher both signed a voluntary acknowledgment of paternity. The twins' birth certificates, dated August 27, 2001, listed Christopher as their natural father. Pamala and Christopher lived together and both cared for the children together until their relationship ended in August of 2001, and they separated.
¶ 6. On September 6, 2001, Christopher filed a petition for custody of the children. Pamala answered and claimed that Christopher was not their natural father. Pamala asked the court to order a paternity test and award attorney's fee and damages for invasion of privacy.
¶ 7. On October 24, 2001, the chancellor entered an order that granted temporary custody of the twins to Christopher and required that Pamala, Christopher and the children submit to a "blood paternity test."
¶ 8. Pamala filed a motion to dismiss Christopher's petition for custody. She argued that Christopher lacked standing to continue his pursuit of custody since he was not the twins' biological father. On March 18, 2002, the chancellor ruled that, by listing Christopher as the children's father on both the acknowledgment of paternity and the birth certificate, Christopher had the necessary standing to support his petition for custody. The chancellor again ordered a blood test to confirm paternity.
¶ 9. The blood tests were conducted. The results of the blood tests confirmed that Christopher was not the biological father of the twins.
¶ 10. After hearing evidence in this case on December 20, 2001, March 3, 2003, and March 17, 2003, the chancellor entered *751 her memorandum opinion and final judgment on March 25, 2003. The chancellor awarded permanent care, custody, and control of the children to Pamala, denied Christopher's petition for custody and denied Pamala's request for attorney's fees and sanctions. Both Pamala and Christopher appeal.

STANDARD OF REVIEW
¶ 11. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002).

ANALYSIS

I. Did the chancellor err in denying Pamala's request for attorney fees?
¶ 12. The determination of attorney's fees is largely within the sound discretion of the chancellor. Martin v. Martin, 566 So.2d 704, 707 (Miss.1990). We follow the general rule that where "a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." Martin, 566 So.2d at 707. An award of attorney's fees is governed by the factors established in McKee v. McKee, 418 So.2d 764, 767 (Miss.1982): (1) the relative financial ability of the parties, (2) the skill and standing of the attorney employed, (3) the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, (4) the time and labor required, (5) the usual and customary charge in the community, and (6) the preclusion of other employment by the attorney due to the acceptance of the case. Bruce v. Bruce, 687 So.2d 1199, 1203 (Miss.1996)(citing McKee v. McKee, 418 So.2d 764, 767 (Miss.1982)).
¶ 13. In her consideration, the chancellor only looked at the evidence to prove the fees incurred in preparing and arguing the motion to dismiss. Before they argued the motion to dismiss, the parties agreed that no evidence admitted in the previous hearings would be considered. The chancellor found that this agreement extended to any evidence regarding the issue of attorney's fees. Therefore, no evidence from the previous custody hearings about Pamala's financial status of Pamala was considered. Pamala argues that the chancellor erred in failing to consider her previous declaration of her indigence, in her order dated March 25, 2003, and her reliance on food stamps and Medicaid. Based upon the totality of the evidence, she argues that her inability to pay her attorney's fees was established.
¶ 14. We have held that the party seeking attorney's fees is charged with the burden of proving inability to pay. Riley v. Riley, 846 So.2d 282, 287-88(¶ 23)(Miss.Ct.App.2003). Pamala did not meet this burden of proof. By the agreement of the parties, the motion to dismiss limited the chancellor's consideration to only the evidence pertaining to the motion to dismiss hearing. Pamala neither proved that she was unable to pay attorney fees nor presented evidence of any of the McKee factors. Without evidence showing Pamala's inability to pay, the chancellor's denial of Pamala's request for attorney's fees was not an abuse of discretion. This assignment of error is without merit.

II. Did the chancellor err by refusing to award attorney's fees and impose sanctions under the Mississippi Litigation Accountability Act?
¶ 15. Next, Pamala argues that attorney's fees and sanctions were warranted *752 under the Mississippi Litigation Accountability Act. Pamala maintains that once the paternity test determined that Christopher was not the natural father of the children, Christopher's subsequent contention that he had rights as their father constituted misrepresentations and false filings. She claims that Christopher's continuous pursuit of custody after the paternity determination constituted a frivolous claim worthy of sanctions under the Act.
¶ 16. The relevant portion of the Mississippi Litigation Accountability Act reads:
Except as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney if the court, upon motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.
Miss.Code Ann. § 11-55-5(1)(Rev.2002). Thus, under this statute, the court shall award attorney fees and costs against a party who brings a claim without "substantial justification" or "unnecessarily expanded the proceedings." Id.
¶ 17. A claim is without "substantial justification" when it is "frivolous . . . as determined by the court." Miss.Code Ann. § 11-55-3(a)(Rev.2002). To determine whether a claim is frivolous pursuant to the statute, we examine the definition of "frivolous" found in Rule 11 of the Mississippi Rules of Civil Procedure. Norton v. Norton, 742 So.2d 126, 132(¶ 27)(Miss.1999); Leaf River Forest Products, Inc. v. Deakle, 661 So.2d 188, 197 (Miss.1995). Under Rule 11, a claim is frivolous "only when, objectively speaking, the pleader or movant has no hope of success." Norton, 742 So.2d at 132(¶ 27); Stevens v. Lake, 615 So.2d 1177, 1184 (Miss.1993)(quoting Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331, 1335 (Miss.1989)); Smith v. Malouf, 597 So.2d 1299, 1303 (Miss.1992)(applying Rule 11 definition to Litigation Accountability Act context).
¶ 18. Christopher's claim was not frivolous. Based on the evidence before this Court, Christopher was and remains the legal father of the children. Thus, his petition for custody is justified.
¶ 19. When the children were born, both Pamala and Christopher knew that Christopher was not the biological father of the twins. Both Pamala and Christopher voluntarily signed the acknowledgment of paternity and had Christopher listed as the twins' father on their birth certificates. This act had legal significance. Indeed, under Mississippi law, Christopher became the children's legal father and is entitled and subject to the rights, privileges and obligations thereof.
¶ 20. Mississippi Code Annotated Section 41-57-23(2) and (3)(Rev.2003) provide a procedure, for a child born to a mother who is unmarried (i.e. an illegitimate child), to have the child's father's name added to the birth certificate. This procedure is incorporated in the Mississippi Uniform Law on Paternity, Mississippi Code Annotated Section 93-9-28 (Rev.2004):

*753 (1) The Mississippi Department of Health in cooperation with the Mississippi Department of Human Services shall develop a form and procedure which may be used to secure a voluntary acknowledgement of paternity from the mother and father of any child born out of wedlock in Mississippi. The form shall clearly state on its face that the execution of the acknowledgement of paternity shall result in the same legal effect as if the father and mother had been married at the time of the birth of the child. When such form has been completed according to the established procedure and the signatures of both the mother and father have been notarized, then such voluntary acknowledgement shall constitute a full determination of the legal parentage of the child. The completed voluntary acknowledgement of paternity shall be filed with the Bureau of Vital Statistics of the Mississippi Department of Health. The name of the father shall be entered on the certificate of birth upon receipt of the completed voluntary acknowledgement.
(2)(a) A signed voluntary acknowledgment of paternity is subject to the right of any signatory to rescind the acknowledgment within the earlier of:
(i) Sixty (60) days; or
(ii) The date of a judicial proceeding relating to the child, including a proceeding to establish a support order, in which the signatory is a party.
(b) After the expiration of the sixty-day period specified in subsection (2)(a)(i) of this section, a signed voluntary acknowledgment of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger; the legal responsibilities, including child support obligations, of any signatory arising from the acknowledgment may not be suspended during the pendency of the challenge, except for good cause shown.
¶ 21. Based on Section 93-9-28(1), when the voluntary acknowledgement was signed and notarized, the "voluntary acknowledgement shall constitute a full determination of the legal parentage of the child." (emphasis added). Thus, upon signing, Christopher immediately became the legal father of the children.
¶ 22. There was no evidence that Pamala rescinded the voluntary acknowledgement of paternity during the statutory period. Miss.Code Ann. § 93-9-28(2)(a)(Rev.2004). There was no evidence that the voluntary acknowledgment was challenged based on "fraud, duress, or material mistake of fact." Miss.Code Ann. § 93-9-28(2)(b)(Rev.2004).
¶ 23. On September 6, 2001, when he the petition for custody, Christopher was the legal father of the children. As such, Christopher certainly had legal standing to petition the chancery court for custody of the children.
¶ 24. Also, the record established that Christopher was the only father that the children had ever known. Since birth, Christopher provided for the children in all facets of their life. Christopher paid for their daycare, clothes, food, and any other necessities. Several witnesses testified that Christopher was a loving father capable of permanently caring for the children. There was no reason for Christopher to doubt his success in pursuing custody. Under the recent supreme court decision in Griffith v. Pell, 881 So.2d 184, 186 (¶¶ 6-8) (Miss.2004), Christopher also had a claim for custody of the children under the doctrine of in loco parentis. Citing Logan v. Logan, 730 So.2d 1124 (Miss.1998).
¶ 25. Clearly, this case did not warrant sanctions under the Mississippi Litigation *754 Accountability Act. Neither the chancellor nor this Court finds any impropriety by Christopher or his counsel. Finding no impropriety, we find that the chancellor did not abuse her discretion. We find no merit to this issue and affirm the chancellor's denial of attorney's fees.

III. Did the chancellor use an erroneous standard in determining custody?
¶ 26. Pamala also alleges error in the chancellor's consideration of custody. First, Pamala argues that Christopher did not have standing to continue his pursuit for custody. We previously considered this issue and will not discuss it further. Next, Pamala contends that the chancellor used an erroneous standard to determine the issue of custody. On cross-appeal, Christopher argues the standard employed by the chancellor was erroneous. Therefore, although we find Pamala's argument to be moot given that she was awarded permanent custody, because of Christopher's cross-appeal, we will consider the merits of this issue.
¶ 27. In all child custody cases, the polestar consideration is the best interest of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). In custody battles involving a natural parent and a third party, it is presumed that a child's best interest will be served by placement in the custody of his or her natural parent, as against any third party. In order to overcome this presumption there must be a clear showing that the natural parent has (1) abandoned the child; (2) the conduct of the parent is so immoral as to be detrimental to the child; or (3) that the parent is unfit mentally or otherwise to have custody. Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994).
¶ 28. "We may not always agree with a chancellor's decision as to whether the best interests of a child have been met, especially when we must review that decision by reading volumes of documents rather than through personal interaction with the parties before us. However, in custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong, clearly erroneous, or an erroneous legal standard was employed." Hensarling v. Hensarling, 824 So.2d 583, 586-87(¶ 8) (Miss.2002); Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997); Williams v. Williams, 656 So.2d 325, 330 (Miss.1995).
¶ 29. Both Pamala and Christopher take issue with the chancellor's findings. Pamala contends that the chancellor abused her discretion and was manifestly wrong in applying Albright to this matter. We disagree. In matters pertaining to child custody, the chancellor must consider the guidelines set forth in Albright, 437 So.2d at 1005. Christopher takes issue with the specific findings rather than the standard applied. Christopher argues that the evidence clearly established the he was the best parent for the children, and therefore, he should have custody. Christopher would have this Court reweigh each of the factors.
¶ 30. Given our standard of review, we need not reexamine all of the evidence to see if we agree with the chancellor's ruling. The chancellor sits as finder of fact in a child custody dispute. Rainey v. Rainey, 205 So.2d 514, 515 (Miss.1967); Johnson v. Johnson, 872 So.2d 92(¶ 17)(Miss.Ct.App.2004). Therefore, the chancellor has the responsibility to hear the evidence, assess the credibility of the witnesses, and determine ultimately what weight and worth to afford any particular aspect of the proof. Id. Our job is merely to see if the chancellor's decision is *755 supported by credible evidence. Lee v. Lee, 798 So.2d 1284, 1290(¶ 22) (Miss.2001).
¶ 31. The chancellor correctly applied Albright to this case. The chancellor's opinion considered each of the factors, offered her analysis of the evidence relating to those factors, and then reached a specific conclusion as to each factor. Several of the factors did weigh against Pamala. There was testimony about Pamala's prior use of drugs and alcohol. However, Christopher failed to prove Pamala's continued use of drugs or alcohol. There was testimony of her battle with bipolar disorder. Although Pamala's assertion of the physician-patient privilege prevented full consideration of the effects on her ability to care for the children, Pamala testified that her medication stabilized her health and did not hinder her ability to care for her children.
¶ 32. Although several factors weighed heavily against Pamala, the chancellor provided a detailed analysis of her reasoning to find that the evidence did not support a finding that Pamala was unfit to have custody of the children. The chancellor made on-the-record findings as to each Albright factor, and there is no evidence that her decision was manifestly in error or based on an erroneous legal standard.
¶ 33. The chancellor's memorandum opinion and final judgment was indeed thorough. The chancellor provided sixty-four pages of findings of fact and conclusions of law. The chancellor's analysis of the Albright factors and related issues extends for approximately fifty pages. After considering each Albright factor, the chancellor concluded that Christopher's petition for custody should be denied. The chancellor follows this determination with the following language:
The Court commends Mr. Van Norman, Mr. and Mrs. Bonds, Cary Baptist Church and the Cary community for loving and caring for Shane and Hopelynn.
Ms. Adcock asserts that as a fit parent it is her decision whether or not Shane and Hopelynn should continue their relationship with Mr. Van Norman.
On February 13, 2003 in Warren County Cause No.2003-006GN a Final Judgment was entered in the cause styled Pamala Ann Standish [Adcock], Individually and as next friend of Hopelynn Nicole Van Norman and Shane Anthony Van Norman v. Mississippi State Board of Health and Christopher Alan Van Norman, which directed the Mississippi State Board of Health to change the birth certificates of the minor children, Hopelynn Nicole Van Norman and Shane Anthony Van Norman to recite their last names as Standish and list their father as unknown.
This Court notes that it is without authority to compel Ms. Adcock to allow Shane and Hopelynn to visit with Mr. Van Norman and his family.
. . .
Ms. Adcock chose to bring Mr. Van Norman, his biological family and the Cary Baptist Church into Shane and Hopelynn's life from birth.
The Court would hope that Ms. Adcock WILL NOT say to Shane and Hopelynn, you may never have a relationship with the man you have known as grandparents, aunts, uncles and cousins and the church you have been a part of since the time of your birth.
No matter what harsh words have been said by the parties and their witnesses, the court hopes that Ms. Adcock and Mr. Van Norman can put any negative feelings they have aside and work out their differences for the benefit of Shane and Hopelynn.

*756 The Court encourages Ms. Adcock to allow Shane and Hopelynn to continue a strong and healthy relationship with Mr. Van Norman.
(emphasis in original.)
¶ 34. We are concerned about this language. It is indeed unusual that the chancellor would spend fifty pages stating her factual findings and conclusions related to the Albright factors only to subsequently state that a court in another jurisdiction[1] had already changed the birth certificates of these children. Our concern requires that we reverse and remand on this issue for further proceedings.
¶ 35. This case was filed in 2001. In her responsive pleading filed on October 1, 2001, Pamala challenged the paternity of the children. The issue of paternity and whether Christopher was the father of the children was the or one of the central issues in this litigation. Thus, the Chancery Court of Sharkey County acquired jurisdiction over the parties and the subject matter of this litigation in 2001.
¶ 36. The chancellor's opinion reveals that the Warren County judgment was signed on February 13, 2003, one month before Chancellor Barnes entered her memorandum opinion and final judgment and after Chancellor Barnes began hearing evidence in this case. Based on the case number, "Warren County Cause No.2003-006GN," we can conclude that the Warren County case was filed calendar year 2003. We can also conclude that the issue decided by the Warren County Chancellor was the same as the issues before the Sharkey County Chancery Court in this case.
¶ 37. Clearly, this litigation was pending when the Warren County judgment was entered. Because this case has the identical controversy involving the same parties, the chancellor committed plain error.
¶ 38. In Soriano v. Gillespie, 857 So.2d 64 (Miss.Ct.App.2003), we discussed the doctrine of priority jurisdiction. We held that:
[t]he principle of priority jurisdiction provides that a controversy proceeds in the court of competent jurisdiction which first acquires the controversy, to the exclusion of jurisdiction in any other court. Huffman v. Griffin, 337 So.2d 715, 719 (Miss.1976). See Lee v. Lee, 232 So.2d 370, 373 (Miss.1970). "Priority jurisdiction between courts of concurrent jurisdiction is determined by the date the initial pleading is filed, provided process issues in due course." Euclid-Mississippi v. Western Casualty and Surety Co., Inc., 249 Miss. 547, 559-60, 163 So.2d 676 (1964). Accordingly, this doctrine prohibits a court from taking jurisdiction over a matter, involving substantially the same parties and subject matter, if another court has acquired jurisdiction. John Hancock v. Farm Bureau Insurance Co., 403 So.2d 877, 878-79 (Miss.1981).
Soriano, 857 So.2d at 68(¶ 16).
¶ 39. Without question, the Chancery Court of Sharkey County obtained jurisdiction over Pamala and Christopher and the issue of the paternity of these children in 2001. Because no judgment was yet entered in Sharkey County, the Warren County Chancery court lacked jurisdiction. Id. at (¶ 18). The judgment by the Warren County Chancery court was invalid and of no effect.
*757 ¶ 40. The resolution of this issue is controlled by Griffith v. Pell, 881 So.2d 184 (Miss.2004). The supreme court considered a similar issue. In Griffith, the supreme court consolidated the appeal of two separate cases. Id. at 185(¶ 1). The first case was a divorce action between Robert and Sue Ann Pell. The second case was a paternity action that Sue Ann brought against Joseph Griffith. Id.
¶ 41. Before their marriage, Robert and Sue Ann began to live together and Sue Ann gave birth to a child. Id. Robert thought he was the father of the child and acted as such. Id. During the pendency of their divorce proceeding, Sue Ann gave birth to another child. Id. at (¶ 2). Robert questioned whether he was the father and moved the court for genetic testing to determine the paternity of first child. Robert was not the child's biological father. Id. The chancellor ruled that Robert did not have "legal standing in law or fact on the issue of custody" and terminated Robert's visitation rights. Id. at (¶ 3).
¶ 42. Sue Ann then commenced a paternity action against Joseph Griffith, the biological father of the child. Id. at (¶ 4). Sue Ann and Griffith entered "an agreed order declaring Griffith the biological father, ordering child support, and stating that all other matters would be decided by the chancellor at a later date." Id. The two men then asked the chancellor to declare Robert the legal father of the child. They claimed that it would be in the child's best interest for Robert to continue as the child's father and for Griffith to give up any parental rights that he may have. The chancellor denied this motion, set child support payments for Griffith and awarded him visitation. Id.
¶ 43. The supreme court consolidated both of these appeals. Id. at (¶ 5). For the court, Presiding Justice Waller wrote:
The chancellor held, and Sue Ann argues, that the paternity proceedings foreclosed any rights of custody or visitation Robert may have had with regard to the minor child. We disagree. Merely because another man was determined to be the minor child's biological father does not automatically negate the father-daughter relationship held by Robert and the minor child. Indeed, in Logan v. Logan, 730 So.2d 1124 (Miss. 1998), we held that the custody of a minor child should be awarded to its stepfather upon the divorce between the stepfather and the child's biological mother. Id. at 1127. We reiterated our recognition of the doctrine of in loco parentis, [FN1] id. at 1126, which clearly applies to Robert.
FN1. A person acting in loco parentis is one who has assumed the status and obligations of a parent without a formal adoption. Logan v. Logan, 730 So.2d 1124, 1126 (Miss.1998). "Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child is said to stand [in loco parentis]." Id. (quoting W.R. Fairchild Constr. Co. v. Owens, 224 So.2d 571, 575 (Miss.1969)).
In Logan, we further held:
Where a stepfather, as an incident to a new marriage, has agreed to support the children of a previous marriage, or where he does so over a period of time and the mother and the children in good faith rely to their detriment on that support, the best interests of the children require entry of a child support decree against the stepfather. Thus, it follows that if a stepparent can be required to pay child support for a stepchild based on his support of the stepchild over a period of time, where it is in the best *758 interests of the child, he should be allowed to have custody of the stepchild based on the affection for and support of that child over a period of time. With the burden should go the benefit.

Id. at 1126 (citation omitted & emphasis added).
Under Logan, because Robert supported and cared for the minor child as if she were his own natural child, under state law, he may be required to pay child support for the minor child. It therefore follows that he may be awarded custody and/or visitation rights with the minor child.
Griffith, 881 So.2d at 186 (¶¶ 6-8).
¶ 44. It is clear that Christopher is the children's legal father under Mississippi law. As such, Christopher is entitled and subject to the rights, privileges and obligations thereof. Christopher's name on the children's birth certificate has legal significance.[2] Next, as discussed in Griffith and Logan, Christopher's continuous care of the children, as his children, during the marriage established his rights as the children's legal father. The record supports Pamala's acceptance of Christopher as the children's father.
¶ 45. Once it is determined that Christopher is the children's legal father, he obtains rights that cannot be subsequently relinquished unilaterally. Professor Shelton Hand correctly concludes:
The father of the illegitimate child may, however, render the child legitimate, and such rendition has the effect of establishing the child as a full heir at law of the father. Upon the establishment of the legitimate nature or status of the child, the father then has an equal claim with the mother to the parental and custodial rights to the child. In such a case, the best interest of the child would be the proper criterion for subsequent awards of custody of the child as between the two parents.
N. Shelton Hand, Mississippi Divorce, Alimony & Child Custody § 21:5 (6th ed.2003) (emphasis added).
¶ 46. While we find it was error for the chancellor to determine that Christopher was not the father and we remand it for further proceedings, the remand is limited to determine whether there is any basis for the Christopher to be removed as the children's legal father under Mississippi Code Annotated Section 93-9-28(2)(a) and (b)(Rev.2004). To do so, there must be sufficient evidence that Pamala either rescinded the voluntary acknowledgement of paternity during the statutory period or timely challenged the voluntary acknowledgment based on "fraud, duress, or material mistake of fact." Miss.Code Ann. § 93-9-28(2)(a) and (b)(Rev.2004). Since both Pamala and Christopher were aware from the beginning that Christopher was not the biological father, we cannot see any evidentiary basis to sustain a challenge based on fraud, duress or material mistake of fact but will return that issue to the chancellor to decide.
¶ 47. Christopher signed a voluntary acknowledgement of paternity for children that he and Pamala knew were not his biological children. By signing that document, despite such knowledge, Christopher accepted full responsibility for the support of those children. He immediately became obligated, under the law of Mississippi, to provide for these children. Pamala had no *759 objection, at the time he signed the voluntary acknowledgement, to Christopher's role and legal status as the father of the children. A year later she changes her mind and does have an objection. The law recognized Christopher as the children's father immediately upon the execution of the voluntary acknowledgment. Pamala's desire to terminate her relationship with Christopher does not extinguish the rights, duties and obligation that were created a year earlier. Under different circumstances, if Christopher wanted out of the requirement of supporting the children, we and other courts of this state would have enforced the legal significance of Christopher's status as the children's father based solely on the execution of the voluntary acknowledgement of paternity.
¶ 48. To summarize our conclusion, we affirm the chancellor's decision to grant custody to Pamala. The chancellor properly addressed and analyzed each of the Albright factors in her findings. However, we reverse and remand for the chancellor to consider whether there is sufficient evidence to revoke the legal rights Christopher obtained when he signed the voluntary acknowledgement of paternity and became the legal father of the children. If there is not such evidence, the chancellor shall declare null and void the order of the Warren County Chancery court and take such action to have Christopher's name replaced on their birth certificates and their names changed. The chancellor shall also enter an order to establish reasonable visitation for Christopher and to obligate Christopher to pay statutory child support.

IV. Did the chancellors exhibit a clear bias against Pamala?
¶ 49. Finally, Pamala argues that the chancellors exhibited a bias against her evidenced by their failure to expedite this matter. As evidence of bias, Pamala points us to: (1) the chancellor's refusal to hear arguments on various motions, (2) the chancellor's refusal to remove the contempt charge against her and resulting fine, and (3) the chancellor's denial of a continuance.
¶ 50. It has been consistently held that "[u]nder the appropriate standard, the judge is presumed qualified and unbiased. This presumption may only be overcome by evidence showing beyond a reasonable doubt that the judge was biased or not qualified." Norton v. Norton, 742 So.2d 126, 131 (¶ 22)(Miss.1999); Collins v. Joshi, 611 So.2d 898, 901 (Miss.1992).
¶ 51. Pamala makes only general allegations. Pamala presents no specific evidence to this Court establishing how she was prejudiced by the chancellor's denial of her motions. Furthermore, Pamala admits that she "has no law at hand to support the argument that the courts showed bias against her throughout this case." On this fact alone, we cannot find the chancellor was biased beyond reasonable doubt. Given that the presumption of bias was never created, we find this issue wholly without merit.
¶ 52. THE JUDGMENT OF THE SHARKEY COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, P.J., MYERS, CHANDLER, BARNES AND ISHEE, JJ., JOIN THIS SEPARATE OPINION.
KING, C.J., LEE, P.J., AND IRVING, J., CONCUR IN RESULT ONLY.
NOTES
[1] Chancellor Barnes sits on the Ninth Chancery Court District. This district includes both Sharkey and Warren County. Chancellor Barnes may take judicial notice of the orders within her jurisdiction. Chancellor Barnes' chambers are in Warren County.
[2] Mississippi Code Annotated Section 41-57-23(2) and (3)(Rev.2003) provide a procedure, for a child born to a mother who is unmarried, to have the child's father's name to be added to the birth certificate. Christopher and Pamala both signed the signed the voluntary acknowledgment of paternity.